# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:05cr0058 (SRU) |
| JOSE LUIS RODRIGUEZ | |

### Ruling on Defendant's Motions for Post-Conviction Relief

On May 25, 2006, after two weeks of trial, a jury convicted Jose Luis Rodriguez of conspiracy with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine and/or 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The jury found that Rodriguez was part of a drug ring headed by Alex Luna that distributed cocaine in and around Danbury, Connecticut. Testimony and other evidence that the prosecution presented indicated that Rodriguez worked closely with Jose Adames, a.k.a. "Ponpa," and others in New York City, transporting large quantities of cocaine to Connecticut for purchase by Luna. That evidence further indicated that Rodriguez was primarily a driver for the drug ring, frequently bringing Adames to Connecticut to meet with Luna and arrange or conduct purchases of "bricks" of cocaine that would later be broken down and re-sold to both users and lower-level drug sellers in the Danbury area.

In the time since the jury convicted Rodriguez, he has filed a number of motions seeking relief, primarily in the form either of a new trial or an acquittal as a matter of law. Rodriguez contends that: (1) there is no evidence that he knowingly and intentionally joined the Luna conspiracy, or was involved as more than a driver with no knowledge of the illicit nature of that conspiracy; (2) the government did not comply with my order to file a bill of particulars and did

not provide Rodriguez with adequate specificity regarding the charges against him; (3) in violation of Federal Rules of Evidence 608(b) and 403, I allowed testimony regarding specific instances of collateral conduct, namely, whether Rodriguez had ever handled narcotics; and (4) because the Jencks Act permitted the government to withhold certain evidence from Rodriguez until well into trial, the Jencks Act is unconstitutional. In addition, Rodriguez has moved for his release pending sentencing.

For the reasons discussed below, Rodriguez's motions (**docs. # 657, 661, 667, 796, 939**) are DENIED.

**I.      Testimony of Officer Cuba and Maria Robles**

   A.     Rule 608(b)

Rodriguez argues in his motions that I improperly admitted testimony from Officer Waldo Cuba of the New York Police Department and from Maria Robles. Both Robles and Cuba testifed as rebuttal witnesses for the government following Rodriguez's own testimony. Robles testified that Rodriguez went with Adames to Connecticut once a week to deliver drugs to Luna, that he discussed with her bringing cocaine from the Dominican Republic, Tr. 5/23 at p. 2045, ln. 10 - p. 2046, ln. 21, and that on two or three occasions, Rodriguez brought cocaine to Danbury by himself, without Adames. *Id*. at p. 2047, ln. 20 - p. 2048, ln. 5. Cuba in turn testified that, on March 30, 2005, he observed Rodriguez in possession of a small magnetic box containing small bags of what appeared to be narcotics.[1] *Id.* at p. 2071, ln. 15 - p. 2073, ln. 7.

---

[1] It is important to note that Cuba had arrested Rodriguez in New York after observing him handling narcotics. His testimony, however, was not introduced to prove a prior bad act or a specific instance of conduct, but rather to contradict statements made by Rodriguez on the witness stand. As I instructed the jury, "Mr. Cuba is here for purposes of providing testimony intended to impeach or contradict the testimony given by Mr. Rodriguez. The activities that were

That testimony, of Robles and Cuba, was properly admitted to impeach Rodriguez following statements he made during his direct and cross-examination.

The government, in its case-in-chief, presented testimony from several witnesses who stated that Rodriguez regularly drove Adames to Connecticut for the purpose of conducting large-quantity drug sales with Luna. On direct examination, Rodriguez's attorney asked him if, during the period between 2001 and 2004, he saw "any drug deliveries of any kind." *Id.* at p. 1884, ln. 12-13. Rodriguez responded, "No, I never see no drugs. . . ." *Id.* at ln. 14. Rodriguez later testified on direct that he never saw any "traps" used to hide and transport drugs in any vehicles, *id.* at p. 1913, ln. 2-4, and that except for "a little problem" he "never got in trouble before." *Id*. at p. 1917, ln. 13-19.

On cross-examination, following that testimony on direct, Rodriguez testified that he never saw Adames selling drugs on the street, *id*. at p. 1945, ln. 6-9, and that during the time period of the conspiracy alleged in his indictment Rodriguez never saw any drugs except for marijuana, *id.* at p. 2030, ln. 2-6.

Rodriguez now challenges the admissibility of testimony from Cuba and Robles under Federal Rule of Evidence 608(b). That rule states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of

---

just testified to are outside the scope, that is, the time frame of the allegations of the indictment and, therefore, may not be considered by you for purposes of deciding the substance of the charges in the indictment but rather, can be considered only for purposes of impeaching Mr. Rodriguez." Tr. 5/23 at p. 2073, ln. 10-19.

> another witness as to which character the witness being cross-examined has testified.
>
> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters that relate only to character for truthfulness.

Although Rule 608(b) generally prohibits extrinsic evidence of specific instances of conduct, an exception to that rule exists when evidence contradicts a witness's testimony. Impeachment by contradiction, as opposed to evidence of a witness's character for truthfulness or untruthfulness, is a permissible exception to the general proscription of Rule of 608(b). *See, e.g., United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995); *United States v. Tarantino*, 846 F.2d 1384, 1409 (D.C. Cir. 1988). As the *Perez-Perez* court stated,

> Of course, [the testimony in question] would not only have suggested that [the witness] was of bad character but would also have contradicted [his] own denials on the witness stand. Impeachment by contradiction is a recognized mode of impeachment not governed by Rule 608(b), but by common-law principles. But, again largely for reasons of efficiency, extrinsic evidence to impeach is only admissible for contradiction where the prior testimony being contradicted was itself material to the case at hand.

72 F.3d at 227 (Internal citations omitted). Similarly, the *Tarantino* court held that although certain testimony was introduced "in order to impeach [a witness's] credibility, the proposed impeachment would not consist of showing specific instances of [that witness's] conduct ( i.e., fraudulent or dishonest behavior) indicative of untruthfulness. We think it only this latter type of evidence that Rule 608(b) addresses." 846 F.2d at 1409 (citing *United States v. Opager*, 589 F.2d 799 (5th Cir. 1979) (Rule 608(b) applies solely to evidence showing a witness's general character for truthfulness)).

Here, as in *Perez-Perez* and *Tarantino*, Waldo and Cuba gave testimony that impeached Rodriguez's testimony because it directly contradicted his statements on the witness stand, not

4

because it showed specific instances of untruthful behavior or character. Consistent with the caveat in *Perez-Perez* that prior testimony being contradicted was itself material to the case at hand, Rodriguez's testimony – that during the period of the alleged conspiracy he had never seen drugs except for marijuana, never seen drug deliveries, and never seen a "trap" – was material to the charges against Rodriguez and his alleged role in the Luna drug organization.

In his memorandum in support of his motion for a new trial or acquittal, Rodriguez argues that Cuba's testimony should not have been admitted because "[t]he fact at issue here is the unrelated, misdemeanor arrest of Mr. Rodriguez on a matter which is closed and for which the record is sealed." Mot. Dismissal at 4 (doc. # 667). As discussed above, that argument is misplaced. "The fact at issue" to which Cuba's testimony was relevant, as I instructed the jury, was whether Rodriguez was truthful on the witness stand, not whether his prior arrest made it more or less likely that Rodriguez had a character for untruthfulness.

The cases that Rodriguez relies on support the proposition that, when a witness testifies to certain facts, opposing counsel may introduce extrinsic evidence to impeach by contradiction. That witness may not use Rule 608(b)'s prohibition on extrinsic evidence to prove specific instances of untruthfulness as a shield, permitting him to testify falsely with no opportunity for impeachment. Indeed, Rodriguez emphasizes in his brief that, as the court held in *Walder v. United States*, 347 U.S. 62, 65 (1954), "there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." Further, the *Walder* court distinguished *Walder* from another case, where the government attempted to open the door to certain extrinsic evidence by asking a defendant on cross-examination if he had ever seen narcotics before. *Id.* at 66. Here, Rodriguez

opened the door; the government did not.

Rodriguez further argues that, as opposed to cases such as *Walder*, his testimony involved no provable contradiction, and he did not offer to testify about the conduct that formed the basis of Cuba's and Robles's rebuttal testimony. Mot. Dismissal at 8, 10. When Rodriguez made broad statements regarding his exposure to drugs and drug deliveries, however, he testified about facts that could be provably contradicted. Cuba's and Robles's testimony actually did contradict that testimony.

Because Rule 608(b) bars extrinsic evidence of specific instances of a witness's character for untruthfulness, and Robles and Cuba offered testimony to directly contradict statements Rodriguez made on the witness stand rather than to prove specific instances of untruthfulness, Rodriguez's argument that admission of that testimony violated Rule 608(b) lacks merit.

B.  Rule 403

At trial and in his written submissions, Rodriguez argues that Robles's and Cuba's testimony violated Rule 403 because the prejudicial effect of that testimony substantially outweighed its probative value. Rodriguez himself took the stand and denied the evidence offered by the government in its case-in-chief, making Rodriguez's credibility the single most important issue in his case. That Cuba's and Robles's testimony may have increased the likelihood of a conviction does not, by itself, establish undue or unfair prejudice, and is not grounds for a new trial. *See, e.g., United States v. DeLillo*, 620 F.2d 939, 947 n.2 (2d Cir. 1980) ("The prejudice resulting to defendants from the fact that introduction of the evidence was damaging to their case is, of course, not the kind of prejudice against which Fed.R.Evid. 403 protects defendants").

6

C. <u>Rule 404(b)</u>

In addition to the reasons discussed above, Cuba's testimony was properly admitted under Rule 404(b), which states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Under established Second Circuit precedent, "404(b) evidence" may be admissible "for any purpose other than to show a defendant's criminal propensity." *United States v. Lombardozzi*, 491 F.3d 61, 78 (internal quotation marks and citations omitted). Here, Rodriguez testified that he never observed drug transactions and was never part of those transactions with Adames and Luna. Cuba's testimony was not offered to prove that Rodriguez had a prior drug arrest and was therefore more likely to be guilty of the drug charges that he faced, but instead to contradict statements Rodriguez made on direct and cross-examination.

## II. Evidence of Rodriguez's Knowing Involvement in the Luna Organization

Rodriguez contends that "with or without the testimony of Officer Cuba . . . there was insufficient evidence to convict" him of the crime charged. Mot. Dismissal at 2. Reversal of Rodriguez's conviction "is warranted only if no rational factfinder could have found the crimes charged proved beyond a reasonable doubt." *United States v. Gaskin*, 364 F.3d 438, 459-60 (2d Cir. 2004) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Throughout Rodriguez's trial, witnesses testified consistent with the jury's ultimate finding of guilt. Rodriguez is correct that Officer Cuba was the only law enforcement officer to testify that

7

he saw Rodriguez handle drugs, but even without that testimony, there was ample evidence for a jury to find that Rodriguez knowingly participated in the Luna organization.

Evidence that the government introduced at trial included physical surveillance conducted by law enforcement agents, video of Rodriguez and Adames meeting at Luna's apartment, and a statement Rodriguez made post-arrest to federal law enforcement officials where he admitted driving with Adames from New York to Connecticut for the purpose of selling large quantities of drugs (and that he was present in New York when Luna would purchase kilogram quantities of cocaine).

Along with that evidence, numerous witnesses testified to Rodriguez's involvement, in drug deals, usually with Luna and Adames. Nelson Rosa testified that Rodriguez and Adames would deliver drugs to Luna in Danbury, and otherwise was involved in drug sales with Luna and his associates.[2] Similarly, Jose Pena testified that Rodriguez was present for such drug transactions.[3] Nicky Carrasquillo testified that Rodriguez and Adames together made drug deliveries to Luna on multiple occasions, that Rodriguez and Adames supplied Carrasquillo with cocaine, and that Rodriguez and Adames on multiple occasions compressed cocaine as well.[4]

---

[2] Tr. 5/11 at p. 395, ln. 6-23; p. 397, ln. 11-23; p. 415, ln. 14-25 (Rosa testified that on certain occasions, after Adames told him to, Rodriguez would retrieve cocaine from his car to bring to Luna); p. 419, ln. 17-22 (Rosa testified that Rodriguez received money for drugs on one occasion in New York); p. 422, ln. 7-15 (Rosa testified that Rodriguez was present when powder cocaine was "cooked" into crack cocaine on one occasion in Danbury); p. 428, ln. 14-21; p. 433, ln. 3-24; p. 440, ln. 20 - p. 441, ln. 2; 5/15 at p. 568, ln. 15-21; p. 587, ln. 16-21.

[3] Tr. 5/15 at p. 699, ln. 24 - p. 700, ln. 21; p. 710, ln. 15 - p. 711, ln. 8; p. 733, ln. 23 - p. 734, ln. 10.

[4] Tr. 5/17 at p. 1185, ln. 7-12; p. 1196, ln. 13-15; p. 1202, ln. 17-18; p. 1204, ln. 25 - p. 1205, ln. 9; p. 1210, ln. 17-19; p. 1212, ln. 7 - p. 1213, ln. 7.

Joshua Febres provided similar testimony,[5] as did Maria Robles (during the government's case-in-chief).[6] Robles also testified that Rodriguez met with "Rubio," an individual who various testimony indicates was the New York source of cocaine for the Luna organization, and that Rodriguez and Adames on at least one occasion took Luna's place as the head of the drug organization while Luna was on vacation.[7]

Without going into specific details of each witness's testimony, which would only serve to belabor the point, the government introduced ample evidence, including testimony of cooperating witness and coconspirators, to support Rodriguez's conviction. Rodriguez challenges the sufficiency of the evidence against him. A jury could have reasonably credited Rodriguez's testimony, and discredited the testimony of the witnesses against him, which was thorough and capable. There was more than enough evidence, however, that if a jury credited the witnesses against Rodriguez rather than his own testimony, it could have found him guilty beyond a reasonable doubt. Indeed, that appears to be exactly what happened.

### III. The Government's Bill of Particulars

Prior to trial, and again during trial, Rodriguez and his co-defendants moved for an order compelling the government's production of a bill of particulars, so that they could be on notice of and adequately defend against specific conduct that the government alleged. Docs. # 416, 580,

---

[5] Tr. 5/18 at p. 1412, ln. 8-20; p. 1417, ln. 1-6.

[6] Tr. 5/18 at p. 1472, ln. 15-17; p. 1475, ln. 5-25.

[7] Tr. 5/22 at p. 1519, ln. 22-24; p. 1523, ln. 11-24; p. 1524, ln. 23 - p. 1525, ln. 3; p. 1542, ln. 4-22.

9

617. I granted that motion on May 9, 2006.[8] Doc. # 568. The government moved for me to reconsider my order that they produce a bill of particulars, which I denied. Ultimately the government produced a lengthy summary of alleged criminal activity that described, albeit somewhat broadly, the conduct that the defendants were alleged to have committed as part of the Luna conspiracy.

Although the government did not provide a traditional bill of particulars, which would have set forth more specific information concerning the allegations of the defendants' involvement with the Luna conspiracy, the summary of evidence the government produced was sufficient to satisfy the purpose of my order. In addition, although the government's evidence against the defendants, including Rodriguez, was at times far-reaching, review of the trial transcript demonstrates a lack of the sort of unfair surprise that a bill of particulars guards against. In other words, Rodriguez may have had a difficult time defending himself, but the vast discovery the government provided, along with the somewhat narrower summary of criminal activity, satisfied any concerns about unfair surprise and a lack of notice of evidence against him.

## IV. Constitutionality of the Jencks Act

Rodriguez argues that, because the Jencks Act permitted the government to withhold certain evidence from Rodriguez until well into trial, the Jencks Act is unconstitutional. I agree with Rodriguez that, because the Jencks act permits the government to withhold inculpatory

---

[8] As part of its argument against producing a bill of particulars, the government argued that bills of particulars are rarely ordered in the District of Connecticut. In my experience, that is true. Here, however, where multiple defendants were charged with participating in a years-long conspiracy that included both identified and unidentified coconspirators, the defendants were entitled to know of what conduct, specifically, they were being accused. The reasons for my ordering a bill of particulars are set out more fully in my written ruling on that question as well as in the trial transcript.

evidence until deep into trial, defendants are frequently at a disadvantage and unable to effectively counter certain evidence against them.  Despite those concerns, the Supreme Court of the United States and the Second Circuit have repeatedly held the Jencks Act constitutional.  *See, e.g., Palermo v. United States*, 260 U.S. 343, 353 n.11 (1959) (Jencks Act "does not reach any constitutional barrier"); *United States v. Simmons*, 281 F.2d 354, 359 (2d Cir. 1960); *see also United States v. Aquart*, No. 3:06cr160 (PCD), 2006 WL 2684304 at *5 (D. Conn. Sept. 19, 2006) ("As the Second Circuit has stated, unless and until the Supreme Court rules otherwise we shall adhere to [our prior decisions] and hold that the enactment of [the Jencks Act] was a valid exercise of Congressional power") (internal citations and quotation marks omitted).  Thus, clear precedent forecloses the argument that the Jencks Act is unconstitutional.

## V. Rodriguez's Motion for Release Pending Sentencing

Rodriguez has moved for release pending sentencing.  Congress has spoken on the question of when a defendant, post-conviction, may be released pending sentencing.  For an individual convicted of a controlled substances offense such as Rodriguez, under 18 U.S.C. § 3143(a)(2),

> (2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless--[9]
>
> > (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
> >
> > (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

---

[9] 18 U.S.C. § 3142(f)(1)(C) describes "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," which includes Rodrigez's offense of conviction.

11

> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

Here, for the reasons discussed above, I have denied Rodriguez's motion for acquittal or a new trial. In addition, the government has not recommended that no sentence of imprisonment be imposed on Rodriguez. Because Rodriguez therefore fails to meet the requirements of either subsection 3143(a)(2)(A)(i) or 3143(a)(2)(A)(ii), the statute binds me to deny his motion for release pending sentencing.

## VI. Conclusion

For the reasons discussed above, Rodriguez's motions for a new trial or acquittal and for release pending sentencing are DENIED.

Dated at Bridgeport, Connecticut, this 25th day of March 2008.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge